**Major TILLERY, Victor Hassine, Kenneth Davenport, William Grandison, Nelson Charles Mikesell and Ellis W. Matthews, Jr., Appellees,**

**v.**

**David S. OWENS, Jr., in his official capacity as the Commissioner of the Pennsylvania Department of Corrections, and George Petsock, in his official capacity as the Superintendent of the State Correctional Institution at Pittsburgh (hereinafter "SCIP"), and**

**Arnold Snitzer, M.D., in his official capacity as a member of the medical staff of State Correctional Institution at Pittsburgh, and Robert Casey, in his official capacity as the Governor of Pennsylvania, Appellants.**

No. 89–3689.

United States Court of Appeals, Third Circuit.

Argued June 25, 1990.
Decided June 29, 1990.

Ernest D. Preate, Jr., Atty. Gen., Thomas F. Halloran (Argued), S. Deputy Atty. Gen., Calvin R. Koons, S. Deputy Atty. Gen., John G. Knorr, III, Chief Deputy

Atty. Gen., Chief, Litigation Section Office of Atty. Gen., Pittsburgh, Pa., for appellants.

Jere Krakoff, Michael S. Antol, Neighborhood Legal Services Ass'n, Edward J. Feinstein, Pittsburgh, Pa., Alvin Bronstein (Argued), Edward I. Koren, National Prison Project, Washington, D.C., for appellees.

Before SLOVITER and MANSMANN, Circuit Judges, and FULLAM, District Judge *

OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

### *Issue*

In this appeal we are called upon to review the district court's findings and conclusion that double-celling inmates in an overcrowded, dilapidated and unsanitary state prison violates the Eighth Amendment prohibition on cruel and unusual punishment. The defendants/appellants also question the extent of the district court's power to ameliorate prison conditions.

Appellees, inmates at the State Correctional Institution at Pittsburgh (SCIP), brought suit in the United States District Court for the Western District of Pennsylvania against David Owens, Jr., Commissioner of the Pennsylvania Department of Corrections, George Petsock, Superintendent of SCIP, Arnold Snitzer, M.D., a member of the medical staff of SCIP, and Robert Casey, Governor of Pennsylvania, claiming that the conditions of their confinement violated the Eighth Amendment. Chief Judge Cohill, after conducting a six-week trial and an unannounced tour of SCIP, issued a comprehensive opinion identifying numerous constitutional violations in the administration of the prison. *See Tillery v. Owens*, 719 F.Supp. 1256 (W.D. Pa.1989). The court held that defendants had failed to provide constitutionally adequate security, fire protection, access to

the courts, medical care, mental health care, and dental services. The court ordered defendants to submit plans to remedy these deficiencies by a specified date. It also ordered them to hire an "environmentalist" to devise and to present plans to remedy the inadequate sanitation, ventilation, plumbing and lighting. It ordered that inmates in disciplinary custody, administrative segregation, and self-lockup be separated from each other and the general population and that random, unannounced cell searches for contraband be commenced immediately. The court appointed a monitor to ensure compliance. Additionally, the court held that considering the totality of the conditions in which inmates were incarcerated, the institution was unconstitutionally overcrowded. As a partial remedy to overcrowding, the court ordered the elimination of double-celling by March 1, 1990. The Commonwealth appeals only from this provision of the order.

Defendants do not defend double-celling as desirable. They view it as an unpalatable stop-gap response to rapid increases in the prison population. *See, e.g.,* App. at 876–80 (testimony of Superintendent George Petsock). They argue that double-celling, while disfavored, is not unconstitutional and that they should not be required to halt the practice.

The problem of double-celling is not unique to SCIP, *see, e.g., Brooks v. Kleiman,* No. 88–5068 (E.D.Pa. July 31, 1989) (double-celling at State Correctional Institution at Graterford, Pennsylvania), *aff'd without opinion,* 899 F.2d 1216 (3d Cir. 1990); *Inmates of Allegheny County Jail v. Wecht,* 699 F.Supp. 1137 (W.D.Pa.1988) (double-celling at Allegheny County, Pennsylvania jail), *appeal dismissed in part, affirmed in part,* 874 F.2d 147 (3d Cir.), *vacated on other grounds,* — U.S. —, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989), *on remand,* 893 F.2d 33 (3d Cir.1990); *Vazquez v. Carver,* 729 F.Supp. 1063 (E.D. Pa.1989) (double-celling at Lehigh County, Pennsylvania prison), or, indeed, to the

---

* Hon. John P. Fullam, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Commonwealth of Pennsylvania. Throughout the nation prison populations are rising at an explosive rate. *See, e.g., U.S. Prison Population Sets Record for a Year, in Six Months*, N.Y. Times, Sept. 11, 1989, at 18, col. 4 (in first six months of 1989 nation's prison population rose by 7.3% to total of 673,565 inmates; figures reflect need for almost 1,800 new prison beds a week); *Behind Bars, an ever-expanding crowd of inmates*, Phila. Inquirer, May 8, 1989, at 1, col. 1 (between 1980 and the end of 1988 nation's prison population increased 90%).

States have been hard pressed to build additional cells to house the hundreds of inmates entering the system and many facilities are overburdened and overcrowded. *See, e.g., More and More, Prison Is America's Answer to Crime*, N.Y. Times, Nov. 26, 1989, sec. 4, at 1, col. 1 (California state prisons routinely operate at 175% of capacity); *Behind Bars*, Phila. Inquirer, May 8, 1989, at 1, col. 1 (forty-two states are under some type of court order to reduce overcrowding; federal prison system housing up to 72% more than designed for; New Jersey state prisons operating at 118% capacity). As a result, inmates are increasingly forced to double-cell. *See, e.g., Heath v. De Courcy*, 888 F.2d 1105 (6th Cir.1989) (Hamilton County, Ohio jail); *Badgley v. SantaCroce*, 853 F.2d 50 (2d Cir.1988) (Nassau County, New York Corrections Center); *Vosburg v. Solem*, 845 F.2d 763 (8th Cir.) (South Dakota State Penitentiary), *cert. denied*, 488 U.S. 928, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988); *Marsh v. Barry*, 824 F.2d 1139 (D.C.Cir.1987) (per curiam) (District of Columbia Central Detention Facility). When double-celling was instituted at SCIP in 1982, it was envisioned as a temporary measure. App. at 859 (testimony of Superintendent Petsock). However, at this time, there is no end to the practice in sight. *Id.* at 861, 875.

The district court's determination that the practice of double-celling at SCIP violates the Eighth Amendment and must be

eliminated was made in light of detailed and meticulous findings of fact concerning overcrowding, staff shortages, health care and environmental conditions, including plumbing, ventilation and sanitation. Although we recognize that our recapitulation of the district court's findings necessarily entails a repetition of what is already set forth in that court's reported opinion, we believe an understanding of the salient facts is necessary to the legal analysis we must undertake.

## II.

### District Court's Findings of Fact

SCIP, which dates to the late 1800s, is a 14–acre complex surrounded by a stone wall. Prisoners are housed in multi-tiered cellblocks in cells that were designed to accommodate one person each. However, since 1982 inmates increasingly have been placed two to a cell because the prison lacked space for its increasing population. At the time of trial, SCIP housed 1,802 inmates, approximately 1,182 of whom were double-celled. The average length of an inmate's sentence is two years, but many serve much longer.

Most inmates are housed in two central structures known as North and South Blocks, which date to the construction of the institution. Each block contains five tiers of cells. North Block contains 640 cells. Of these, 560 cells measure $8 \times 7$ feet, or 56 square feet ("large" cells), and 80 measure $6 \times 6\frac{1}{2}$ feet, or 39 square feet ("small" cells). The top three tiers, containing 363 cells are vacant. According to the district court, the cells are empty "due to inadequate staff." 719 F.Supp. at 1263. The court also noted that the Superintendent of SCIP, George Petsock, testified that the cells had been emptied in anticipation of new housing construction but the construction had not yet begun.[1] Most inmates in North Block are housed individually in the 272 cells that are occupied.

---

1. Apparently, the construction plan is to evacuate and gut the North Block and to demolish the prison industries building in the SCIP complex. New cells would be built on the site of the prison industries building and prison industries would be located in the refurbished North Block. The current number of inmates has made it infeasible to begin the first stage of the plan, evacuation of North Block.

South Block contains 500 cells of 56 square feet each. At the time of trial 741 inmates were housed in South Block and 516 were double-celled.

Another structure, A and B Blocks, built in 1986, contains the Western Diagnostic and Classification Center, known as the clinic, as well as 480 cells for inmates needing special psychiatric care, death-sentenced inmates, and inmates who are segregated, either for disciplinary reasons or to protect them from themselves or others. The third level of Block B, which contains 48 cells, is vacant as a result of a staffing shortage. At the time of trial, approximately 762 inmates were housed in Blocks A and B. Plaintiffs do not complain in this suit about the condition and size of these newer quarters.

A typical cell in North and South Block contains a small toilet, a sink with hot and cold running water, a bed, a desk, and a footlocker. Cells housing two inmates are furnished with two bunk beds and two footlockers. Because the only space provided for storage of personal items is one small shelf and the space under the bed, inmates place their possessions in the small aisle between the bed and the opposite wall, or hang them from clothes lines strung across the room. The usable floor space in a large cell is approximately 23 square feet, or 11½ square feet per inmate in a shared cell, while in the small cells the usable floor space is 15 square feet.[2]

Most inmates in North and South Block spend approximately 14 hours a day in their cells. North Block also houses the overflow of clinic inmates who spend 16 hours a day in their cells. Furthermore, some inmates in North Block are in administrative segregation and must spend 21 to 22 hours a day in their cells for as long as four consecutive weeks. The court found that "[b]ecause these shared cells are so tiny, only one inmate at a time can stand in the cell; the other must lie on the bed." *Id.* at 1264. In fact, when the district judge entered one of the small double cells during his inspection tour, he "was unable to turn around once inside it and had to back out." *Id.* Obviously, physical exercise is impossible in any of the double cells. Essentially, an inmate can only lie on his bunk or sit at the desk or on the bunk.

Each cell contains a lamp mounted above the upper bunk and a desk light. The desk light provides insufficient light for reading. The lamp provides adequate light for the inmate on the top bunk to read, but virtually no light to the inmate on the bottom bunk. Thus the inmate occupying the lower bunk can read, write or engage in hobbies only during the day.

Despite the small size of the cells, 20% to 25% of the inmates fear to leave them for recreation and exercise because they fear physical assault. Much of the insecurity is due to understaffing. For example, the 741 inmates housed in South Block are supervised by only seven officers at most and guards cannot see many areas of the block. Between 1984 and 1988, there were an average of 97 reported inmate assaults each year at SCIP. The district court found that there were many more unreported assaults, and that there was arson, drug use and theft. Weapons such as knives, ice picks, razors and homemade guns are easily available to inmates. Most are manufactured by inmates in the prison industry facilities and smuggled out. Inmates leaving the facility are not searched on a regular basis and no metal detector is in place.

---

**2.** We note that the American Correctional Association standards require a minimum of 60 square feet of cell space for prisoners who spend no more than 10 hours per day in their cells and 80 square feet for those whose confinement exceeds 10 hours per day. American Correctional Association, Standards for Adult Correctional Institutions, standard 2–4129 (Supp. 1989). Similarly, the American Public Health Association standards require a minimum of 60 square feet per person in single cells. American Public Health Association, Standards for Health Services in Correctional Institutions (1976). Although the Supreme Court in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), stated that such expert recommendations " 'do not establish the constitutional minima,' " 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13 (quoting Bell v. Wolfish, 441 U.S. 520, 543–44 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979)), they serve to put the SCIP conditions in perspective.

According to the district court, "the auditorium and gymnasium are virtual dens for violence. Assaults, stabbings, rapes, and gang fights occur in the auditorium. During peak times, several hundred inmates may be present in these facilities with only one corrections officer.... The corrections officers do not make rounds; they wisely choose to stand by the door next to the riot button." *Id.* at 1275.

Outdoor recreation space is limited and also poorly supervised. As a result of recent construction in the complex, the available outdoor space for the 1,800 inmates is limited to approximately half the size of a football field. Inmates in administrative segregation exercise in a yard adjacent to the yard used by inmates in disciplinary segregation. The yards are separated only by a chain-link fence and inmates in disciplinary custody have climbed the fence to fight. No officer is assigned the sole task of guarding these inmates.

The court also found that another result of overcrowding is a shortage of basic supplies such as underwear, jackets, towels and bedding. According to the district court "[i]nmates must often 'borrow' these items from other prisoners, and must pay for them with either usurious interest rates or sexual favors." *Id.* at 1269.

SCIP prison officials have frequently complained about the seriously overcrowded and understaffed conditions. For example, in a memorandum written in 1983, Superintendent Petsock stated that the

staff are tremendously overtaxed with short fuses. Inmates are on edge because they are elbow to elbow. An increase of any type beyond what we are now holding could be a very dangerous situation.

*Id.* at 1267.

In addition to being overcrowded and understaffed, conditions in North and South Block are unsanitary and dangerous. The prison has no general cleaning plan and inmates have sole responsibility for the cleanliness of each cell. However, SCIP fails to provide adequate cleaning supplies so that inmates can clean their cells themselves. Mop heads are never cleaned and

brooms are often unavailable. The insufficient light in the cells also hinders efforts to clean thoroughly. Furthermore, some mentally ill inmates are housed in North Block, and their frequent refusal to clean their cells exacerbates sanitation problems. The prison does not even clean the cell when an inmate is transferred and a new inmate assigned to the cell.

Ventilation is grossly inadequate. During the summers air flow is provided only by opening windows, many of which have been broken either by prison personnel attempting to open them or by prisoners. There are no systems to control temperature or humidity, causing excessive odors, heat and humidity. The insufficient ventilation system "significantly increases the risk of transmission of airborne diseases." *Id.* at 1265.

Vermin are present throughout North and South Blocks. Bed bugs and mice are endemic. Torn mattresses shelter mites, fleas and lice. A sizable bird population has entered the blocks through broken windows and now nests in pipes near the ceiling. The birds drop feces on the floors and railings and "[a]t times, the waste material from birds has been so dense that it has virtually covered the cell block windows." *Id.*

The plumbing is also inadequate. The prison is filled with leaks and puddles; septic water leaking from the shower drains stands in the basement. Most of the toilets in the cells are old and cracked. Urine sediment has accumulated in the cracks causing noxious odors. Urine also accumulates on the rough concrete walls which are difficult to clean. The seals at the bottom of many toilets have dried out, causing floods in the cells. When plumbing repairs are made, "the toilets in the affected cells are unusable, resulting in the accumulation of human waste for as long as 2 days." *Id.* at 1266.

According to the district court, the shower facilities pose "one of the most serious problems in the institution." First, there are an inadequate number, in North Block only one for every 33 inmates and in South block only one for every 62 inmates. Thus,

each inmate can shower three times a week at most. Second, the showers are poorly maintained. Many showers are broken, either not working at all or running continuously. Furthermore, "[t]he showers are encrusted with dirt, ... slime has accumulated in the chronically wet areas," and the smell of putrid water is inescapable. *Id.* at 1266. The district court judge, having inspected the shower area, "wondered how any inmate could tolerate the physical conditions of the shower long enough to wash himself." *Id.* at 1266–67. The most serious problem the district court identified with the showers was lack of security. They are not supervised by a guard and thus weaker inmates fear to enter them; instead they take "'bird baths' from the sinks in their cells." *Id.* at 1266.

Fire safety in North and South Blocks is poor. Although there are fire extinguishers sufficient to battle small fires, there is no equipment for detecting or fighting major conflagrations. The smoke exhaust fans in use do not adequately protect from smoke inhalation. The lack of fire safety equipment is exacerbated by the high concentration of combustible materials in storage areas and in the housing units. In the cells, mattresses, stored personal belongings, and items hanging from the ceilings allow for the rapid spread of fire. One expert testified that South Block has "the highest degree of 'combustible loading'" he had seen during his studies of over 80 prisons. *Id.* at 1278.

If a fire were to occur, evacuation would be difficult. Because there is no master system for unlocking cells, each cell would have to be individually unlocked, a process that would take at least 12 minutes in ideal conditions. It would take at least an additional three minutes for inmates to exit one of the two doors on the block. However, the block could be entirely filled with smoke within only two or three minutes. Furthermore, it is likely that the evacuation would be chaotic and dangerous. The district court heard testimony that during an evacuation in a 1987 fire, officers left the building as soon as the cells were unlocked, and unsupervised inmates blocked the exits and committed assaults. An ex-

pert witness concluded that the poor level of fire protection made it likely that numerous inmates would die if a serious fire broke out.

Medical and psychiatric treatment are also shockingly deficient. There is insufficient staff to treat the increasing number of inmates incarcerated at SCIP, medication is not properly administered, serious illnesses such as AIDS are not diagnosed, inmates with severe mental illnesses are not segregated from the rest of the population, and the area where psychiatric care is given is "in shambles." *Id.* at 1303.

It is within this squalid, dangerous and overcrowded environment that double-celling takes place. Double-celling was instituted because the rapid increase in the prison population during the last decade has been coupled with chronic understaffing. Experts testified that housing inmates in such tight quarters has negative physical and psychological effects, including increased spread of disease, stress, anxiety and depression.

The district court found that these problems are exacerbated by SCIP's inefficient inmate classification system. SCIP procedures provide that an inmate should not be double-celled if he exhibits assaultive, aggressive or sexual behavior problems or has serious psychiatric or medical impairments. Clinic staff evaluate and classify inmates when they first arrive at SCIP. Because the clinic is overcrowded, inmates are sometimes double-celled before they are evaluated. Furthermore, the clinic relies on information provided by the inmate to determine suitability for double-celling. Inmates do not always disclose negative traits and are double-celled. Once an inmate is classified, his classification is to be recorded for the housing office. Such records have not been kept since October 1987. Not surprisingly, "[t]he record is replete with instances where an inmate has been double-celled even though his propensity for violence, emotional instability, primitive personal hygiene habits or past encounters with a designated cell partner clearly dictated that he should be single-celled." *Id.* at 1267.

Because of overcrowding, inmates in protective custody are sometimes housed with inmates in administrative custody, a status reserved for inmates who threaten themselves or others. This practice, is, in the words of one expert witness, tantamount to "putting the chickens in the fox's lair." *Id.* at 1268 (quoting testimony of E. Eugene Miller).

The record before the district court contained numerous examples of the effects of unsuitable double-celling. *See, e.g.,* App. at 1251–55 (testimony of Lieutenant James McFetridge) (inmate forced to double-cell with disturbed inmate who refused to take medication to control his illness, who refused to shower for six months and was infested with lice); App. at 1331–1334 (testimony of inmate James Jones) (witness assaulted cellmate); App. at 1344–55 (testimony of inmate John Matthews) (witness assaulted three times by cellmate after having told administrators his cellmate was threatening him; he was raped by one cellmate); App. at 1369–70 (testimony of inmate Robert Anderson) (witness double-celled with mentally ill inmate who put the witness' bedding in the sink and stood on the toilet all night); App. at 1464 (testimony of inmate Charles Oliver) (witness double-celled with inmate who constantly paced and talked to himself).

Based on this record and its findings of fact, the district court concluded that SCIP was unconstitutionally overcrowded and that sanitation, lighting, shower conditions, ventilation, inmate security, fire safety and health care fell below constitutional requirements.[3] The court believed that conditions fell so far below the constitutional norms that it would be within its power to order the entire facility closed. However, heeding the Supreme Court's teaching that courts should avoid intruding in the operation of state governments and should formulate the least intrusive remedial measures necessary to correct the constitution-

al harm, *see, e.g., Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977), the district court devised a careful remedial order which left much to the discretion of state officials. Although the court provided a detailed analysis of what steps need to be taken to correct the identified deficiencies in understaffing, overcrowding, sanitation, security, fire safety and health care, it left to defendants the task of formulating and presenting to the court their plan for remedying the constitutional violations. In only three areas did the court order immediate action instead of relying on defendants to formulate a plan. Defendants were ordered immediately to begin random cell searches, to separate administrative and disciplinary segregation inmates, and to halt the practice of double-celling which the district court suggested could be done by hiring additional corrections officers to guard the now vacant tiers of cells. The only exception to the prohibition of double-celling was that inmates who request to share a cell may do so.[4]

## III.

### *Discussion*

On appeal, the defendants do not take issue with any of the district court's "basic" or "historical" facts. *See* R. Aldisert, *The Judicial Process* 694 (1976). Instead, they challenge the district court's conclusion that double-celling at SCIP is unconstitutional.

■ The Eighth Amendment prohibits "cruel and unusual" punishment. The Supreme Court has described the amendment as embodying " 'broad and idealistic concepts of dignity, civilized standards, humanity and decency ...' against which we must evaluate penal measures." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968)).

---

3. The district court also made findings concerning inmates' access to the courts and held that the access provided was constitutionally deficient. Because those findings have not been shown to have had a direct impact on the issue presented here, we will not discuss them.

4. Defendants were ordered to end the practice of double-celling by March 1, 1990. The district court later enlarged the time for compliance until June 30, 1990.

There is "[n]o static 'test' ... by which courts determine whether conditions of confinement are cruel and unusual." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Rather, what constitutes cruel and unusual punishment is measured by " 'the evolving standards of decency that mark the progress of a maturing society.' " *Id.* (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Because we look to societal standards as our benchmark, expert opinions and professional standards, while instructive, are not determinative. We must place more weight on " 'the public attitude toward a given sanction.' " *Rhodes,* 452 U.S. at 348–49 n. 13, 101 S.Ct. at 2400 n. 13 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion)); *see Peterkin v. Jeffes,* 855 F.2d 1021, 1027 n. 9 (3d Cir.1988); *Inmates of Occoquan v. Barry,* 844 F.2d 828, 836–39 (D.C.Cir.1988).

 Although our understanding of the Eighth Amendment changes as our society progresses, "the inquiry that courts must conduct in eighth amendment cases is not consequently less exacting." *Peterkin,* 855 F.2d at 1024. The court's judgment must " 'be informed by objective factors to the maximum possible extent.' " *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Rummel v. Estelle,* 445 U.S. 263, 274–75, 100 S.Ct. 1133, 1139–40, 63 L.Ed.2d 382 (1980)). The Eighth Amendment does not give the court authority to impose its own "notions of enlightened policy." *Hassine v. Jeffes,* 846 F.2d 169, 175 (3d Cir.1988). Thus, deficiencies and inadequacies in prison conditions do not necessarily violate the Eighth Amendment. The amendment is violated only where an inmate is deprived of "the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399; *see Inmates of Occoquan,* 844 F.2d at 835–41; *Cody v. Hillard,* 830 F.2d 912 (8th Cir.1987) (en banc), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988).

 The denial of medical care, prolonged isolation in dehumanizing conditions, exposure to pervasive risk of physical assault, severe overcrowding, and unsanitary conditions have all been found to be cruel and unusual under contemporary standards of decency. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (medical care); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (prolonged isolation in unsanitary, overcrowded cell); *Riley v. Jeffes,* 777 F.2d 143 (3d Cir.1985) (security); *Ramos v. Lamm,* 639 F.2d 559 (10th Cir. 1980) (overcrowding, sanitation), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Although prisoners are, undeniably, sent to prison as punishment, the prison environment itself may not be so brutal or unhealthy as to be in itself a punishment. *Battle v. Anderson,* 564 F.2d 388, 395 (10th Cir.1977).

In challenging the district court's holding, defendants contend that double-celling is not *per se* unconstitutional. They rely on the Supreme Court's holding in *Rhodes v. Chapman,* 452 U.S. at 348–49, 101 S.Ct. at 2400–01, that double-celling inmates, under the circumstances in the prison at issue there, did not violate the Eighth Amendment. *See also Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (double-celling pre-trial detainees for short periods does not constitute punishment under due process clause); *French v. Owens,* 777 F.2d 1250, 1252 (7th Cir.1985) (practice of double-celling not *per se* unconstitutional); *but see Battle,* 564 F.2d at 395 (sixty square feet per inmate is constitutional minimum); *Ramos,* 639 F.2d at 568 (reaffirming *Battle* ).

 However, in determining whether conditions of confinement violate the Eighth Amendment we must look at the totality of the conditions within the institution. The Supreme Court made this precept clear in *Rhodes* where it stated that conditions of confinement, "alone, *or in combination,* may deprive inmates of the minimal civilized measure of life's necessities." 452 U.S. at 347, 101 S.Ct. at 2399 (emphasis added).

When faced with claims similar to those raised by these plaintiffs with respect to

other institutions, this court has held that the totality of the circumstances test must be applied to determine whether the conditions of confinement constitute cruel and unusual punishment. In *Union County Jail Inmates v. Di Buono*, 713 F.2d 984 (3d Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984), we reversed the district court order holding that double-celling was unconstitutional because the district court had failed to consider the totality of the circumstances relevant to finding whether conditions of confinement fell below minimal standards of decency. The relevant considerations we identified included the length of confinement, the amount of time prisoners must spend in their cells each day, the opportunities for activities outside the cells, and the repair and functioning of basic physical facilities such as plumbing, ventilation and showers. *Id.* at 1000–01 & n. 30.

In *Peterkin v. Jeffes*, in affirming the district court's rejection of the claims of death row inmates in two Pennsylvania prisons that the conditions of their confinement were unconstitutional, we reiterated that the court must inquire into the totality of the circumstances. We elaborated on the factors to be considered, including food, medical care, sanitation, control of vermin, lighting, heating, ventilation, noise level, bedding, furniture, education and rehabilitation programs, safety and security and staffing. *Peterkin*, 855 F.2d at 1025–26 & n. 7 (incorporating factors enunciated in *Rhodes*, 452 U.S. at 364, 101 S.Ct. at 2408 (Brennan, J., concurring)).

■ In this case, the constitutionality of double-celling must be analyzed in the context of the district court's determination, well supported by the record, that almost every element of the physical plant and provision of services at SCIP falls below constitutional norms. Courts finding double-celling to be permissible have emphasized that the general prison conditions were otherwise adequate. Thus, for example, in *Rhodes v. Chapman*, the Supreme Court stressed that the district court had found the institution to be " 'unquestionably a top-flight, first-class facility,' " 452

U.S. at 341, 101 S.Ct. at 2396 (quoting [*Chapman v. Jaworski* ] 434 F.Supp. 1007, 1009 (1977)), and that its findings concerning environmental conditions, food, provision of medical care and other relevant factors were "generally favorable." *Id.* at 342–43, 101 S.Ct. at 2397. Double-celling had not led "to deprivations of essential food, medical care, or sanitation. Nor did it increase violence among inmates or create other conditions intolerable for prison confinement." *Id.* at 348, 101 S.Ct. at 2400.

Similarly, in *Di Buono*, where we held double-celling in New Jersey's Union County Jail to be permissible, we noted there had been no finding that basic prison facilities such as plumbing and ventilation were inadequate. 713 F.2d at 1001 n. 30. The same was true in *Peterkin* where, unlike SCIP, the prisons were "fairly modern." 855 F.2d at 1026. The area afforded each inmate was significantly greater than that provided here. *Id.* at 1026 & n. 8. There was adequate lighting and bedding. *Id.* at 1026–27. Ventilation and sanitation, while less than desirable, had not led to the development or spread of disease and did not fall below constitutional norms. *Id.* Accordingly, the totality of the circumstances did not fall below constitutional minimums.

On the other hand, double-celling has been found to be unconstitutional where it has been imposed in a decaying physical plant with inadequate staff and security. For example, in *French v. Owens*, where double-celling was one "feature of severely overcrowded, unsafe and unsanitary conditions," 777 F.2d at 1253, the Court of Appeals for the Seventh Circuit found double-celling to be unconstitutional and affirmed a ban on its use. *Id. See also Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980).

■ In this case, the district court did not look merely at the space allotted each double-celled inmate, however inadequate that may be, but looked instead at the totality of conditions in the institution. 719 F.Supp. at 1270, 1273. In its opinion the court determined that the institution was unconstitutionally overcrowded, that light-

ing, ventilation, plumbing, showers and fire safety provisions fell below constitutional norms, that violence and insecurity were pervasive, and that medical and mental health care were constitutionally deficient. It also found that inmates had limited opportunities for recreation outside their cells, that they were double-celled for long periods of time, and that the inadequate screening before double-celling of inmates resulted in "fatal pairings," *id.* at 1268, in which "violent, delusional and predatory inmates are often paired" with inmates who are unable to protect themselves.[5] *Id.* at 1273. In these circumstances, the district court was amply justified in holding that double-celling violated the Eighth Amendment prohibition against cruel and unusual punishment.

Defendants contend that regardless of the totality of the conditions at SCIP, any finding that double-celling is unconstitutional must be predicated on a showing that double-celling itself has caused increased violence, disease, and other negative conditions.[6] For example, the defendants state: "Although the district court characterized the conditions as unsanitary, there is no evidence that this results in any actual health problem for the inmates." Brief for Appellants at 14. We find nothing in the Supreme Court's relevant jurisprudence that suggests that conditions as

deplorable as those at SCIP may not be held to fall below constitutional standards merely because there has not yet been an epidemic of typhoid fever, an outbreak of AIDS, a deadly fire, or a prison riot. Such an approach is at odds with the totality of the circumstances analysis mandated by *Rhodes.* It also ignores the reality that while double-celling may not always cause unconstitutional levels of violence, filth or fire hazard, double-celling in an institution plagued with such problems may be so unbearable as to "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. It is sufficient for the case on appeal that the district court found that double-celling at SCIP increased stress, anxiety, depression and "the opportunity for predatory activities and facilitated the spread of disease, already extant due to the unsanitary conditions." 719 F.Supp. at 1267. We will not disturb a district court's factual findings unless we find they are implausible in light of the entire record and we are left with a firm sense that a mistake has been committed. *Hassine v. Jeffes,* 846 F.2d 169, 174 (3d Cir.1988). Here, because the evidence supports the district court's underlying factual findings, there is an adequate basis to support the district court's conclusion that double-celling in North and South Blocks violates the Eighth Amendment.

---

**5.** Defendants contest the district court's finding that the screening system was of "questionable effectiveness." We note that the district court did not find that the screening process was itself unconstitutional, but merely looked to the inadequacy of the screening process as one relevant factor in the determination of the constitutionality of double-celling. 719 F.Supp. at 1267–68, 1273. Furthermore, although, as defendants assert, there was some testimony before the district court that the screening system has operated successfully, *see* App. at 586A–86B (testimony of Allan Pass, Psychological Services Supervisor of SCIP), there was sufficient testimony supporting the district court's finding that the system was inadequate. *See, e.g.,* App. at 372–75, 400–04 (testimony of Eugene Miller, plaintiffs' expert witness), 1331–43 (testimony of James Jones, inmate).

**6.** In *Cody v. Hillard,* 830 F.2d 912 (8th Cir.1987) (en banc), *cert. denied,* 485 U.S. 906, 108 S.Ct.

1078, 99 L.Ed.2d 237 (1988), the court stated that double-celling violates the Eighth Amendment only where it leads to deprivations of essential needs or increased violence or created other intolerable conditions. However, in overturning the panel opinion which had found the double-celling unconstitutional, the en banc court stressed that prison administrators "have made sincere efforts to maintain a healthful environment," and "[s]ignificantly, many of the District Court's factual findings suggest that the conditions at [South Dakota State Penitentiary], regardless of the impact of double-celling, fall well within constitutional standards." *Id.* at 915. Thus, while the court appears to adopt a rather strict causal requirement, that requirement is not necessary to its outcome, for, according to the facts as it presents them, the totality of the circumstances did not fall below constitutional standards.

## IV.

### Remedy

Defendants also challenge the district court's order requiring them to cease placing inmates in double cells in North and South Blocks by a specified date. They contend that the remedy is not the least restrictive possible and that the court's other remedial orders were sufficient to address the constitutional deficits identified. In particular, they characterize the order as impermissibly invading the state's prerogative to manage its own institutions because it will require the state to reduce the population at SCIP and transfer inmates to other, already overburdened state institutions.

■ The Supreme Court has enunciated several principles to guide the district courts in exercising their equitable powers which, although they stem primarily from school desegregation cases, are equally applicable in the prison context. First, the nature of the "remedy is to be determined by the nature and scope of the constitutional violation" and thus must be "related to 'the *condition'* alleged to offend the Constitution." *Milliken v. Bradley (Milliken II*), 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (quoting *Milliken v. Bradley (Milliken I*), 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) (emphasis in original)). Second, the decree must be limited to remedial purposes. *Milliken II*, 433 U.S. at 280, 97 S.Ct. at 2757; *Milliken I*, 418 U.S. at 746, 94 S.Ct. at 3128. Finally, the remedy must "take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken II*, 433 U.S. at 281, 97 S.Ct. at 2757; *see Missouri v. Jenkins*, — U.S. —, —, 110 S.Ct. 1651, 1661–65, 109 L.Ed.2d 31 (1990); *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971).

Within these guidelines, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann*, 402 U.S. at 15, 91 S.Ct. at 1276.

In both school desegregation and prison cases the Court has upheld powerful and wide-sweeping remedial orders. In *Swann*, the district court, over the school board's objections, ordered a variety of techniques, including busing students and pairing and grouping schools, to desegregate the Charlotte–Mecklenburg school system. 402 U.S. at 9–11, 91 S.Ct. at 1272–74. The Supreme Court found these remedial methods to be "reasonable, feasible and workable." *Id.* at 31, 91 S.Ct. at 1283. Similarly, in *Milliken II*, the district court had found *de jure* segregation in the Detroit public school system and formulated a remedial order that, in addition to busing students to achieve racial balance, required remedial programs in reading, in-service teacher training, non-discriminatory educational testing, and counseling and career guidance. 433 U.S. at 275–76, 97 S.Ct. at 2754–55. The Supreme Court rejected the school district's argument that these remedies exceeded the scope of the constitutional violation, stating that the remedy fell within "the broad and flexible equity powers of the court." *Id.* at 288, 97 S.Ct. at 2761.[7]

■ The Court's approach has been no different in its consideration of remedial orders in the prison context. Although it has emphasized that "the problems of prisons in America are complex and intractable, and ... not readily susceptible of resolution by decree," *Rhodes*, 452 U.S. at 351 n. 16, 101 S.Ct. at 2401 n. 16 (quoting *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)), the Court has not hesitated to af-

---

**7.** The Court's recent reversal of a district court order increasing property taxes levied by the Kansas City, Missouri school district to ensure funding for desegregation of city schools speaks more to the specific issue of power of the district court to levy taxes than to the more general question of the permissible scope of remedial orders. *See Missouri v. Jenkins*, — U.S. —, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990). Indeed, the Court stated that it was within the district court's equitable powers to enjoin the state law that barred the school district from increasing taxes. *Id.* at —, 110 S.Ct. at 1665–67.

firm remedial orders correcting constitutional deficiencies in conditions of confinement. In *Hutto*, it upheld both the district court's conclusion that long-term placement in Arkansas punitive isolation cells violated the Eighth Amendment and its order limiting placement in those cells to 30 days. 437 U.S. at 688, 98 S.Ct. at 2572. The district court order had been based in part on the poor diet, rampant violence and overcrowding in the cells. *Id.* at 687, 98 S.Ct. at 2571–72. The Supreme Court noted that the district court's order "is supported by the interdependence of the conditions producing the violation. The vandalized cells and the atmosphere of violence were attributable, in part, to overcrowding and to deep-seated enmities growing out of months of constant daily friction. The 30–day limit will help to correct these conditions." *Id.* at 688, 98 S.Ct. at 2572. One element of the Court's analysis focused on the fact that the defendants had failed to devise and implement their own plans for remedying constitutional violations. *Id.* at 687, 98 S.Ct. at 2571–72. However, "there is no basis for concluding, either from *Hutto* or from equity principles generally, that the courts may exercise their power to impose equitable remedies only after local authorities have been found wanting at the remedial stage at least once." *Inmates of Occoquan,* 844 F.2d at 851–52 (Greene, J., dissenting).

In attempting to remedy the dilemma of the nation's prisons, district courts have imposed a wide variety of remedial measures, including orders requiring the closing of aging and unsanitary institutions, imposing population caps or ordering the cessation of double-celling, and prohibiting certain disciplinary practices. Many orders directing the effectuation of necessary relief have been affirmed by the courts of appeals. *See, e.g., Inmates of Allegheny County Jail v. Wecht,* 874 F.2d 147 (3d Cir.) (affirming order that jail be closed), *vacated on other grounds,* —— U.S. ——, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989), *on remand,* 893 F.2d 33 (3d Cir.1990) (case rendered moot by stipulation between par-

ties); *French v. Owens,* 777 F.2d 1250 (7th Cir.1985) (affirming imposition of population cap, prohibition of double-celling, ban on use of mechanical restraints, required appointment of additional medical staff); *Wellman v. Faulkner,* 715 F.2d 269 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984) (affirming imposition of population cap); *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.) (affirming imposition of population cap), *vacated in part on other grounds,* 688 F.2d 266 (5th Cir.1982) (per curiam), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Johnson v. Levine,* 588 F.2d 1378 (4th Cir.1978) (en banc) (affirming order requiring close of section housing mentally ill patients). *But see Inmates of Occoquan,* 844 F.2d 828 (reversing imposition of population cap); *Cody,* 830 F.2d 912 (en banc) (reversing prohibition on double-celling).

Defendants suggest that the district court order unduly interferes with the state's administration of its prison system because the end of double-celling in North and South Blocks "requires an immediate reduction in population there; this, in turn, requires that they be absorbed by a statewide system which is already thirty-seven percent over capacity and which receives two hundred twenty five inmates a month more than it releases. The district court's double celling order in this case appropriates the department." Appellants' Brief at 20. Although defendants protest that they will have to transfer SCIP inmates to other state prisons in order to comply with the order, that is not necessarily the only option. The district court clearly suggested that inmates who have been double-celled could be housed in the vacant cells in North Block and Block A, stating:

Prompt action is necessary to relieve the egregious conditions imposed on inmates by double-celling. With sufficient staff, more cells can be utilized. Defendants will have to take immediate steps to eliminate double-celling in the North and South Blocks by hiring sufficient addi-

tional corrections officers to staff the now vacant tiers.

719 F.Supp. at 1274. Thus, defendants had at hand the option of hiring more guards so that the empty tiers could be used rather than transferring inmates to other institutions.[8]

Defendants have not contended that they should not be required to hire additional staff, that the vacant cells at the time of the district court's order were not sufficiently numerous, or that requiring them to fill those cells is too intrusive a remedy. It appears from the record that, given the current SCIP population, there were sufficient empty cells to permit the end of double-celling without transferring any inmates from the institution.[9] Thus, defendants' objection that the order prohibiting double-celling was overly intrusive and had a negative effect on the entire state prison system appears, at best, overstated even if some inmates would have to be transferred elsewhere under the district court's order. We recognize that this situation is a fluid one and that transfers from other institutions may contract the number of available cells. Nonetheless, even if there were no empty cells, we could not hold in light of this record that the district court's remedy to ameliorate the unconstitutional conditions was an abuse of discretion.

Defendants also argue that because the constitutional violations the district court identified will be remedied by the compliance plans submitted to the district court, the ban on double-celling is unnecessary and at best, premature. They assert that they should have been given the opportunity to remedy many of the conditions which bear upon the "totality of the circumstances" determination before the court ruled upon the constitutionality of double-celling.

Once it was established, however, that the practice of double-celling violates contemporary norms of decency in light of the conditions currently extant at SCIP, the district court's order prohibiting the practice of double-celling was well within its equitable powers. SCIP is plagued with an aging, deteriorated physical plant and a rapidly growing population, and it has insufficent staff to adequately manage the institution. There is, as the Supreme Court described in *Hutto,* an "interdependence of the conditions producing the violation." *Hutto,* 437 U.S. at 688, 98 S.Ct. at 2572. Not all of these interdependent conditions are equally egregious and not all can be ameliorated immediately. The district court is entitled to require immediate correction of those conditions that it finds to contribute most significantly to the constitutional violations identified and that it determines can be most readily remedied.

It may be that once compliance plans are submitted, approved and implemented, the conditions at SCIP will improve sufficiently so that the district court, at defendants' request and upon a showing of such improvement, will modify its decree to permit double-celling. *See French,* 777 F.2d at 1253 (adopting this approach). Today, however, the final plans have not yet been submitted to the court, much less approved and implemented.[10] Until that day comes, the district court not only had the power but the moral and legal obligation to relieve the inhumane and unconstitutional conditions to which double-celled inmates at SCIP are daily subjected. The duration of its order is thus placed directly in the hands of the defendants. We hold merely that the district court did not exceed its broad remedial power in ordering the cessation of double-celling in North and South Blocks.

---

**8.** We note that the district court's order that defendants devise a plan to replace North and South Blocks within a reasonable time is not before us.

**9.** We note that there is no estimate in the record as to how many inmates will voluntarily choose to remain double-celled, which will, of course, reduce the number of inmates that must be

transferred. Moreover, we note as well that there is no challenge to double-celling within Blocks A and B, and those Blocks are not subject to the district court's order.

**10.** The environmentalist's plan was due by May 15, 1990. The parties have until August 1, 1990 to discuss their differences and to make a joint submission to the court.

## V.

### *Conclusion*

For the foregoing reasons, the order of the district court will be affirmed. The mandate is to issue forthwith.