Darryl ROUSE, Charles Brooks, Stephen Jankowski, Julio Baez, and Robert Kammerer, on behalf of a class of themselves and other similarly situated, Plaintiffs,

v.

William PLANTIER, William H. Fauver, Dr. Robert Cardinale, Dr. Narsimha Reddy, Elaine Allen, R.N., John Doe, and Jane Roe, Defendants.

No. Civ.A. 90–3511.

United States District Court,
D. New Jersey.

Dec. 5, 1997.

Lawrence S. Lustberg, James E. Ryan, Mark A. Berman, Crummy, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, for plaintiffs, Darryl Rouse, Charles Brooks, Stephen Jankowski, Julio Baez, Robert Kammerer.

Peter Verniero, Attorney General of New Jersey, E. Jayroe Wurst, Deputy Attorney General, William P. Flahive, Deputy Attorney General, Richard J. Hughes Justice Complex, Div. of Law, Fedcor Section, Trenton, NJ, for defendants, William Plantier, William H. Fauver, Dr. Robert Cardinale, Dr. Narsimha Reddy, and Elaine Allen, R.N.

## OPINION

ORLOFSKY, District Judge.

On September 4, 1990, litigation over the medical treatment provided to diabetic inmates at the Adult Treatment and Diagnostic Center in Avenel, New Jersey began when Plaintiff, Darryl Rouse, filed a *pro se* complaint.[1] After seven years of litigation, Defendants, William Plantier, William H. Fauver, Dr. Robert Cardinale, Dr. Narsimha Reddy, and Elaine Allen, R.N., have now moved for summary judgment on the claims advanced by Plaintiffs, Darryl Rouse, Charles Brooks, Stephen Jankowski, Julio Baez, and Robert Kammerer. Plaintiffs' claim that they were subjected to "cruel and unusual punishment" in violation of the Eighth Amendment to the United States Constitution and that they were victims of impermissible discrimination on the basis of their disability in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

Defendants have moved for summary judgment on the merits of Plaintiffs' Eighth Amendment and ADA claims, and in the

---

**1.** Several months into the litigation, Judge Debevoise appointed the law firm of Crummy, Del Deo, Dolan, Griffinger & Vecchione, P.C., to represent Rouse, and eventually the class, *pro bono.* The Court extends its sincere thanks to that firm and its attorneys who have worked tirelessly on this matter over the past 6 1/2 years.

alternative, on their defense of qualified immunity as to both claims. These motions require an examination of the contours of a prisoner's murky right to constitutionally adequate medical care under the Eighth Amendment and the sometimes opaque doctrine of qualified immunity.

For the reasons set forth below, Defendants' motion for summary judgment on the merits of Plaintiffs' Eighth Amendment claims will be denied as against Defendants, Plantier, Dr. Cardinale, Dr. Reddy, and Nurse Allen, and granted as against Defendant, Fauver. Defendants' motion for summary judgment on their defense of qualified immunity to Plaintiffs' Eighth Amendment claims will be denied as to Defendants, Plantier, Dr. Cardinale, Dr. Reddy, and Nurse Allen, and dismissed as moot as to Defendant, Fauver. Defendants' motion for summary judgment on their defense of qualified immunity to Plaintiffs' claim under the ADA will be granted as against all Defendants. Finally, Defendants' motion for summary judgment on the merits of the ADA claim will be dismissed as moot as to all Defendants.

## I. Facts and Procedural History

The Plaintiffs were inmates at the Adult Diagnostic and Treatment Center ("ADTC"),[2] a facility operated by the New Jersey Department of Corrections, located in Avenel, New Jersey. *See* Second Amended Complaint ¶¶ 1, 6–10 (dated Aug. 2, 1993) (hereinafter Second Amend. Compl.).[3] All of the Plaintiffs are diabetics, and represent a class of all former, present, and future insulin-dependent diabetic ADTC inmates.

*Id.* at ¶¶ 1, 6–10, 17–18; *Rouse v. Plantier,* Civil Action No. 90–3511, slip op. at 27 (D.N.J. Mar. 26, 1996) (Bassler, J.) (certifying class of all former, present, and future insulin-dependent diabetics incarcerated at the ADTC, and a subclass of all former and present insulin-dependent diabetics incarcerated at the ADTC) (hereinafter *Rouse II* ).[4]

Defendant, William B. Fauver ("Fauver"), is Commissioner of the New Jersey Department of Corrections.[5] Second Amend. Compl. at ¶ 11. Defendant, William Plantier ("Plantier"), is Acting Superintendent of ADTC. *Id.* at ¶ 12. Defendant, Dr. Robert Cardinale ("Dr. Cardinale"), is Medical Director at ADTC. *Id.* at ¶ 13. Defendant, Dr. Narsimha Reddy ("Dr. Reddy"), was a physician at ADTC. *Id.* at ¶ 14. Defendant, Elaine Allen, R.N., ("Nurse Allen"), was formerly a nurse at ADTC with supervisory responsibilities, *Id.* at § 15. *See also* Defendants' Brief at 3; Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment 3 (dated Sept. 8, 1997) (hereinafter Plaintiffs' Brief).

Plaintiffs' first claim is that the medical care provided by ADTC to treat their diabetic conditions is "uniformly and grossly inadequate as to constitute deliberate indifference to serious medical needs in violation of the Eight [sic] Amendment to the United States Constitution." Second Amend. Compl. at ¶ 2; *see also id.* at ¶¶ 3, 61–67. While not pled as such, the Court has read this allegation as a cause of action under 42 U.S.C. § 1983. *See Rouse v. Plantier,* Civil Action No. 90–3511, slip op. at 4 (D.N.J. June 30,

---

**2.** It appears that none of the Plaintiffs is currently incarcerated at ADTC. *See* Plaintiffs' Brief at 1 n.*. Following his release from ADTC, Plaintiff, Stephen Jankowski ("Jankowski"), died in April, 1994. *See* Defendants' Amended Brief in Support of Defendants' Motion for Summary Judgment 18 (dated Oct. 11, 1997) (hereinafter Defendants' Brief). The temporary administrator of Jankowski's estate was substituted for Jankowski. *See Rouse v. Plantier,* Civil Action No. 90–3511, Order (D.N.J. Oct. 1, 1996) (Cavanaugh, M.J.). I discuss below the effect of the fact that none of the named Plaintiffs is currently incarcerated. *See* Part IV, *infra.*

**3.** ADTC is a correctional facility specifically designed to incarcerate and treat sex offenders. *See, e.g.,* Jonathan Kerr, *Bills Call for Cuts to New Jersey Sex Offender Treatment Center, West's Legal News* (Oct. 21, 1996).

**4.** Defendants have asserted that Defendant, Robert Kammerer ("Kammerer"), is no longer an insulin-dependent diabetic. *See* Defendants' Brief at 13. I discuss below what effect his status would have on his role as a class representative. *See* Part IV, *infra.*

**5.** The Court is informed that Fauver tendered his resignation on or about November 6, 1997, effective, approximately, December 31, 1997.

1995) (Bassler, J.) (hereinafter *Rouse I*).[6]

In their Second Amended Complaint and through factual and expert discovery, Plaintiffs have identified the central axes by which a constitutional program of diabetic care would be measured. Plaintiffs have identified those axes as: blood sugar control, nutrition and diet, patient education, prevention and management of acute and long term complications of diabetes, and diabetic-specific primary care needs. *See* Plaintiffs' Brief at 6–15; Second Amend. Compl. at ¶¶ 25–31. Plaintiffs claim that on all of these, the level of care provided by Defendants to the insulin-dependent diabetic inmates of ADTC is inadequate to the point of being unconstitutional. *See, e.g.,* Plaintiffs' Brief at 6–15 noting opinion of Dr. Michael Cohen, Plaintiffs' primary medical expert). In addition to the systemic problems with the medical care provided to insulin-dependent diabetics, Plaintiffs also argue that "specific instances of grossly inadequate care" have occurred and that they constitute, in and of themselves, violations of the Eighth Amendment. *See* Plaintiffs' Brief at 16–17 (detailing problems with respect to foot problems of Plaintiffs, Brooks and Darryl Rouse ("Rouse")). Finally, Plaintiffs allege that the constitutionally deficient medical care was the result of the Defendants' deliberate indifference to Plaintiffs' serious medical needs. *See* Second Amend. Compl. at ¶¶ 24, 64–66.

Plaintiffs' second claim is that the Defendants have failed to provide adequate medical care and thereby reasonably accommodate their medical needs and have precluded them from participating in various prison programs, a violation of the American with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA") *See* Second Amend. Compl. at ¶¶ 72–74, *Rouse I*, slip op. at 16–17 (alleging services to which Plaintiffs claim to have been denied access); *but see* Plaintiffs' Brief at 38–39.

The Court may exercise jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1343(a)(3–4). *See Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero,* 426 U.S. 572, 574, 96 S.Ct. 2264, 2268, 49 L.Ed.2d 65 (1976) (noting complement between section 1983 and section currently codified in section 1343(a)(3)); *Hilfirty v. Shipman,* 91 F.3d 573, 577 (3d Cir.1996) (noting jurisdictional complements of 42 U.S.C. § 1983); *Gares v. Willingboro Township,* 90 F.3d 720, 725 (3d Cir.1996) (same).

## II. Standard of Review on Motion for Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983).

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences therefrom in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987); *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).

---

**6.** During the course of this litigation, Judge Bassler also granted Defendants' motion to dismiss claims for money damages against the Defendants in their official capacities, to the extent such claims were advanced. Also, Judge Bassler dismissed the following asserted grounds for relief: claims by Plaintiffs, Charles Brooks ("Brooks") and Jankowski, against Dr. Reddy; and Jankowski's claims against Nurse Allen. *See Rouse I,* slip op. at 17 & *passim.*

In deciding whether triable issues of fact exist, Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson,* 477 U.S. at 255–56, 106 S.Ct. at 2513–14.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except for those for which the non-moving party has provided evidence to show that a question of material fact remains. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," *id.,* "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *see also Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10 ("by its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990) ("[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit"); *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the " 'mere scintilla' threshold"), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

Finally, it should be noted that "summary judgment is no longer a disfavored procedural shortcut and may present the district court with the first opportunity to dispose of meritless cases." *Id.* at 1362 (citations omitted). This is true even "in cases where motive and intent play leading roles." *Id.* Nonetheless, it is inappropriate for a court to resolve factual disputes and to make credibility determinations. *Id.* at 1363.

## III. Discussion

### A. Eighth Amendment

#### 1. Liability

■ In general, to establish a violation of the Eighth Amendment right to be free from "cruel and unusual punishment [ ]," U.S. Const. amend. VIII; *see Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (applying Eighth Amendment to states through Fourteenth Amendment), a plaintiff must show a prison official's "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); *see also Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991) (distinguishing between "emergency situation" and "prison conditions" cases and finding that "deliberate indifference" constitutes wantonness in prison conditions cases); *see, e.g., Reynolds v. Wagner,* 128 F.3d 166,

1997 WL 652741, *3, *5 (3d Cir. Oct.22, 1997) (noting "deliberate indifference" and "serious medical needs" prongs of *Estelle* test and finding that charging inmates who can pay for medical care does not constitute deliberate indifference or violate due process); *Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326 346 (3d Cir.1987) (noting *Estelle* test), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).

In construing the meaning of "deliberate indifference," specifically, whether it expresses a state of mind closer to "recklessness" as embodied in civil or criminal law, the Supreme Court has held:

> that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994); *see also id.* at 842, 114 S.Ct. at 1981 ("it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm").

A serious medical need is, the Third Circuit has held, a medical need "that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity of a doctor's attention." *Lanzaro*, 834 F.2d at 347.

While the acts or omissions constituting a violation of the Eighth Amendment must be "sufficiently harmful to evidence deliberate indifference to serious medical needs," *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir.1987), cert. denied, 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *see also Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977 ("deprivation must be, objectively, 'sufficiently serious' [so as to] result in the denial of the 'minimal civilized measure of life's necessities' "); Reynolds, 128 F.3d 166, 1997 WL 652741, *4 (discussing harm requirement); *Cook v. Boyd*, 881 F.Supp. 171, 174 (E.D.Pa.1995), a plaintiff need not trace a harm to one specific act or omission. As the Supreme Court has noted, "some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304–05, 111 S.Ct. at 2327–28; *see, e.g., White v. Napoleon*, 897 F.2d 103, 109 (3d Cir.1990) (allegations of persistent conduct evidenced by numerous instances of flawed medical treatment stated cause of action for violation of Eight Amendment, raised inference of deliberate inference, and was not claim for mere negligence or medical malpractice); *Peterkin v. Jeffes*, 855 F.2d 1021, 1025–26 (3d Cir.1988) ("district court must inquire whether 'the challenged conditions alone or in combination' violate [E]ighth [A]mendment standards"); *Banks v. Mannoia*, 890 F.Supp. 95, 98 (N.D.N.Y.1995) ("pattern of omissions may permit inference of deliberate indifference"); *Dye v. Sheahan*, 1995 WL 109318 (N.D.Ill. Mar.10, 1995) ("repeated acts of negligence may be some evidence of deliberate indifference").

Defendants' position in arguing for summary judgment is not that diabetes is not a serious medical condition or that diabetes does not create serious medical needs. Defendants do not dispute that the failure to treat the disease adequately can cause a variety of problems in the short term (*e.g.*, excessive urination, constant thirst and hunger, weakness, confusion, dizziness, seizures) and substantial complications in the long term (*e.g.*, damage to eyes, feet, nerves, and kidneys). *See* Defendants' Brief at 2–3; *see also* Plaintiffs' Brief at 5. Indeed, Defendants virtually conceded the seriousness of the medical needs of diabetics at oral argument.

Instead, Defendants, dividing Plaintiffs' allegations into two groups, those related to diet and those related to medical care, argue that on both the "diet claim" and the "medical care claim" there is no genuine factual dispute as to a serious deprivation. Second, they argue, there is no genuine factual dispute as to Defendants' deliberate indifference

to Plaintiffs' diet and medical needs. Defendants' Brief at 22–30. The factual showing made by Defendants, however, in support of their arguments does not approach the standard for summary judgment, and the motion for summary judgment as to Plaintiffs' Eighth Amendment claims must be denied as against all Defendants except Fauver. As against Fauver, Plaintiffs have failed to designate specific facts showing that there is a genuine factual issue, particularly Defendants' claim that there is no factual evidence that Fauver was deliberately indifferent.

### a) Diet

■ First, with respect to the "diet claim," Defendants partially misconstrue Plaintiffs' Second Amended Complaint. Defendants' view the diet claim as one limited to the palatability of the food. This excessively cramped interpretation misses the constitutional significance of the allegations. Plaintiffs' claim is not merely that the food is unappetizing, although this is surely an element of the allegation, see, e.g., Second Amend. Compl. at ¶¶ 36, 53, 59. Rather, the thrust of the Second Amended Complaint with respect to diet is that the failure of the Defendants to provide a diet tailored to and adequate for the needs of insulin dependent diabetic inmates, in combination with other inadequacies in the care provided for their diabetes, constitutes deliberate indifference to serious medical needs. See, e.g., id. at ¶¶ 24, 25 (failure to provide diet appropriate for diabetics), 36 (diabetic meals are not related to caloric need), 47 (Jankowski was unjustifiably deprived of diabetic meal plan), 54 (failure to provide nutritional education); see also Plaintiffs' Brief at 10–11.

When Defendants do address the heart of Plaintiffs' claims regarding diet, they assert perfunctorily that there is no genuine issue of fact that the inmates are served a meal appropriate for their diabetic condition. Defendants' Brief at 23. For this proposition, Defendants lamely cite the deposition of a food supervisor at ADTC, someone remarkably unlikely to be qualified to give an opinion as to what constitutes a medically appropriate diet for a diabetic.[7]

Even if this were adequate to show a lack of a genuine factual issue on the adequacy of the diet provided to diabetic inmates at ADTC, and it is not, Plaintiffs' have responded more than sufficiently to show the existence of a material factual dispute. Plaintiffs point to their primary medical expert's comprehensive evaluation of the diet provided to diabetic inmates and his findings of numerous deficiencies (e.g., lack of portion control, unavailability of diabetes-appropriate meals, snacks, or low-sugar foods, and failure to individualize diets). Plaintiffs also point to substantial evidence that diet meals were on some occasions spoiled, otherwise inedible, or unavailable. See, e.g., Plaintiffs' Exh. 26–27. Furthermore, although Defendants' assert with great specificity that each of the named Plaintiffs refused the diet meals which were provided to them, see, e.g., Defendants' Brief at 7–8, 12, 14, 16, 19; Defendants' Exh. C, Plaintiffs have raised a substantial factual question as to the accuracy and meaning of these calculations, noting that "refusals" of diet meals may actually mean that a Plaintiff requested an additional diet meal, see, e.g., Plaintiffs' Exh. 25.

Finally, Defendants note that Plaintiffs occasionally purchased food from the prison canteen or commissary which was inappropriate for a diabetic, see, e.g., Defendants' Brief at 8, 12, 16, the suggestion being that Plaintiffs have, to some extent, aggravated or caused any harms attributable to an insufficient diet. However, this suggestion loses any force it might have had in light of Plain-

---

7. It is somewhat surprising that Defendants do not rely more upon the report prepared by their expert witness, Dr. William E. Ryan, for this proposition. A closer examination of that report, which was submitted by Plaintiffs as part of the materials offered in opposition to Defendants' motion for summary judgment, reveals that Defendants' failure to rely upon their expert was probably a tactical decision. The report is characterized by vagueness, suppositions based on hotly disputed facts, and comments which suggest a lack of scientific objectivity. See, e.g., Plaintiffs' Exh. 4 at 4–5, 9–10. Furthermore, it is not the type of comprehensive evaluation of ADTC's diabetes care that would be particularly useful. Finally, it is little more than a critique of Plaintiffs' expert report, and a nitpicking one at that, avoiding the central elements of Plaintiffs' expert report.

tiffs' showings that: 1) snacks appropriate for diabetics may not have been available; 2) Plaintiffs may have been forced to supplement their diet because the diet meals left them hungry; and 3) Plaintiffs may not have been appropriately educated as to what was an appropriate snack. *See, e.g.*, Plaintiffs' Brief at 10–11; Plaintiffs' Exh. 1 at 5–9; Plaintiffs' Exh. 4 at 4 (Defendants' expert noting that inmates are "uninformed" about management of their diabetic conditions).

On the question of whether Defendants have met their burden of demonstrating that no genuine issue of material fact exists as to whether the Defendants exhibited deliberate indifference, the showing made by the Defendants is minimally adequate to show that any of the Defendants did not "know[ ] of and disregard[ ] an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1978, especially since a prison official's knowledge of a risk is an intensely factual question, *see id.* at 842–43, 114 S.Ct. at 1981–82. *See Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553. Plaintiffs have responded by demonstrating the existence of disputed factual questions regarding the mental states of Defendants, Plantier, Dr. Cardinale, Dr. Reddy, and Nurse Allen, and the obviousness and pervasiveness of the risks of harm with respect to dietary issues. *See, e.g.*, Plaintiffs' Exh. 14, 18, 21, 22, 26, 27.

■■■ However, with respect to Defendant, Fauver, Plaintiffs' response to Defendants' assertion that there is no evidence of deliberate indifference, *see* Defendants' Brief at 23–24, does not defeat summary judgment. Plaintiffs' argument is that Fauver must have been aware of the allegations "from at least the time that [he] answered interrogatories in 1995." Plaintiffs' Brief at 29. This response to Defendants' contention that there is no evidence of Fauver's deliberate indifference, *see Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553, is wildly speculative: Of what was Fauver put on notice by the interrogatories, which are neither attached nor specified by Plaintiffs? Of what could Fauver have reasonably been put on notice by the interrogatories? What were Fauver's responses to the interrogatories? On summary judgment, the non-movant must come forth with

specific, affirmative, even if circumstantial, evidence, *see Hamilton v. Leavy*, 117 F.3d 742, 748 (3d Cir.1997), *Baker v. Lehman*, 932 F.Supp. 666, 669–70 (E.D.Pa.1996), of "what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)" *id.* at 747 (citing *Farmer*, 511 U.S. at 839, 114 S.Ct. at 1980). Drawing all reasonable inferences in favor of Plaintiffs does not require a court to imagine or invent evidence, but only to draw logical inferences which are supported in fact. Plaintiffs have provided no specific facts from which an inference regarding Fauver's mental state could be drawn and thereby fail to show a triable issue of fact as to Fauver's mental state.

Moreover, Plaintiffs misconstrue the language they cite from *Farmer*. It is not the litigation itself or mere service of interrogatories which puts a defendant on notice of objectively intolerable risks to inmate safety, but "the evidence before the district court," *see Farmer*, 511 U.S. at 846 n. 9, 114 S.Ct. at 1984 n. 9. The rule seemingly advanced by Plaintiffs—that mere service of interrogatories approximately five years into the litigation can sufficiently establish awareness of objectively intolerable risks such that a party served with interrogatories can be deemed deliberately indifferent to serious medical needs—does not comport with the very case Plaintiffs cite. *See Farmer*, 511 U.S. at 845–46, 114 S.Ct. at 1983–84 ("to survive summary judgment, [the plaintiff must come forward with evidence from which it can be inferred that the defendant-officials were *at the time suit was filed, and are at the time of summary judgment*, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so") (emphasis added).

In short, granting summary judgment to Defendants, Plantier, Dr. Reddy, Dr. Cardinale, and Nurse Allen, would require the drawing of numerous inferences; not only are the inferences Defendants suggest tenuous ones, on summary judgment, those inferences must be drawn in favor of the nonmoving party. Therefore, I conclude that substantial factual questions exist regarding the constitutional adequacy of the diet pro-

vided to the Plaintiffs, as that claim has been asserted against Defendants, Plantier, Dr. Reddy, Dr. Cardinale, and Nurse Allen. Summary judgment as to those Defendants is therefore inappropriate. Summary judgment as to Defendant, Fauver, is, however, appropriate.

### b) Medical Care

■ On Plaintiffs' claims with respect to the medical care that they received at ADTC, Defendants argue that the care received by Plaintiffs was not constitutionally inadequate. Noting correctly that "a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment," *see Napoleon*, 897 F.2d at 110; Defendants' Brief at 24, Defendants contended vigorously at oral argument that expert witnesses do not establish the constitutionally minimal standard of medical care to which prison inmates are entitled. Armed with this proposition, Defendants assert with passionate intensity that the undisputed evidence of what level of medical care the Plaintiffs did receive demonstrates that summary judgment is appropriate. This argument presumes too much and makes one logical leap too many.

■ At the outset it should be said that the role of expert testimony in proving a violation of the Eighth Amendment is somewhat more limited than normal. This is because an Eighth Amendment violation is to be measured with respect to "contemporary standards of decency," *Rhodes v. Chapman*, 452 U.S. 337, 349 n. 13, 101 S.Ct. 2392, 2401 n.13, 69 L.Ed.2d 59 (1981) (citing *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)), not with respect to what a particular expert deems necessary. Expert witnesses, who are not generally relied upon to define or conclusively establish the meaning of distinctly legal concepts, *see, e.g., Woods v. Lecureux*, 110 F.3d 1215, 1219–21 (6th Cir.1997), simply cannot by themselves "establish the constitutional minima." *Rhodes*, 452 U.S. at 349 n. 13, 101 S.Ct. at 2401 n. 13; *see also id.* at 351, 101 S.Ct. at 2401 (court's inquiry as to whether prison conditions violate Eighth Amendment "springs from *constitutional* requirements")

(citation omitted and emphasis added); *Young v. Quinlan*, 960 F.2d 351, 359 (3d Cir.1992) ("great weight [must be placed] on the public attitude towards a given sanction, rather than on expert opinions"); *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir.1990).

■ Nonetheless, expert testimony may be helpful in understanding the prevailing norms against which conditions in a particular prison are to be evaluated. *See, e.g., Rhodes*, 452 U.S. at 364 n. 12, 101 S.Ct. at 2408 n. 12 (Brennan, J. concurring). This is particularly true where the issue is the adequacy of medical care, as opposed to issues more closely linked to prison security. The decisions by prison officials with respect to medical care are entitled to less deference than decisions related to prison security. *See Whitley v. Albers*, 475 U.S. 312, 320–22, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986) (noting deference extended to decisions regarding prison security measures, as compared to those involving medical care); *Rhodes*, 452 U.S. at 349 n. 14, 101 S.Ct. at 2401 n. 14 ("prison's internal security is peculiarly a matter normally left to the discretion of prison administrators"); *Sample v. Diecks*, 885 F.2d 1099, 1109 (3d Cir.1989) ("less deference [to decisions of prison officials], and hence a more lenient state-of-mind requirement from a prisoner-plaintiff's point of view, is required with respect to the provi[sion] of medical care to inmates"); *Langley v. Coughlin*, 715 F.Supp. 522, 543 (S.D.N.Y.1989). Thus, expert testimony is very likely to be helpful to a court in deciding whether, the level of care provided was adequate as a matter of medical science, and ultimately, whether the care provided meets the standard of constitutional adequacy. *See, e.g., Johnson v. Philadelphia*, 1996 WL 735256, *3 (E.D.Pa. Dec. 6, 1996); *see also Tillery*, 907 F.2d at 426 (holding that, although court's inquiry is based on evolving societal standards, inquiry must be exacting and made in light of objective factors).

■ With this in mind, it cannot be said as a matter of law that the level of care provided to the Plaintiffs was constitutionally adequate. First, with respect to blood testing ("accuchecks"), Plaintiffs had accuchecks on as many as twenty-five or twenty-seven days

during the year, for example, Rouse in 1993 or Brooks in 1993, *see* Defendants' Exh. B3, D3. However, the same Plaintiffs also had accuchecks on as few as three or five days during a year, for example, Rouse in 1994 or Brooks in 1994. *See* Defendants' Exh. B3, D3.[8] Also, in a little more than six years of incarceration at ADTC, Kammerer had opportunities to have his blood checked on about seven days per year. *See* Plaintiffs' Exh. E3. Similarly, Jankowski's blood, it appears, was tested on average about 9.5 times per year during his seven years of incarceration. *See* Defendants' Exh. G3–G4. *See* also Defendants' Brief at 6–7, 11–12, 16, 18, 25; Plaintiffs' Exh. 23A–E; Defendants' Exh. B3, D3, E3, F3, G4. Given the standard of care which Plaintiffs' experts have articulated and supported with reference to medical literature, *see, e.g.,* Plaintiffs' Exh. 1–3, 5; Plaintiffs' Exh. 14 at 40–42, it cannot be said, as a matter of law that there was no serious deprivation of medical care, *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977.

Indeed, while Defendants' expert, Dr. Ryan, concluded that "in general ... the glucose monitoring and subsequent care [at ADTC] was [sic] entirely appropriate," and backhandedly criticized Plaintiffs' expert, Dr. Michael D. Cohen, for setting a frequency for glucose monitoring which Dr. Ryan deemed too high, Plaintiffs' Exh. 4 at 6–7, not even Dr. Ryan specifically opined that the frequency of monitoring provided for the Plaintiffs was adequate as a matter of current medical practice. *See, e.g.,* Defendants' Exh. O at 61; Plaintiffs' Exh. 4. Furthermore, even if Dr. Ryan's report shows that the frequency of "accuchecks" was sufficient to constitute a constitutionally acceptable level of medical care for Plaintiffs, the reports of Dr. Cohen and a second Plaintiffs' expert, Dr. Matthew J. Miller, constitute much more than a "scintilla" of evidence on this question. *See, e.g.,* Plaintiffs' Exh. 1 at 4 ("[t]he current standard of care for diabetes requires frequent blood sugar monitoring, at least three

to four times per day"), Exh 2 at 2 ("at the very least, all insulin-requiring diabetics should monitor their blood glucose levels on a daily basis. The opportunity to measure blood glucose at least [three] times daily is a reasonable standard to which we should aspire."); *see also id.* at 3 (noting disagreement between Dr. Miller and Dr. Cohen regarding frequency of glucose monitoring). Quite clearly, substantial questions of fact remain regarding what frequency of glucose monitoring for these Plaintiffs would be adequate as a matter of medical science, and ultimately, as a matter constitutional law.

On all of the other axes by which a reasonable course of treatment would be measured, the reports of Dr. Cohen and Dr. Miller, combined with the report of Dr. Vincent N. Jarvis, who examined Rouse and evaluated his course of treatment, *see* Plaintiffs' Exh. 3, show the existence of substantial questions of fact on at least the following issues: 1) the adequacy of care of Rouse and Brooks' feet, *compare* Plaintiffs' Exh. 1 at 13–14 *with* Plaintiffs' Exh. 4 at 11; 2) the adequacy of eye care provided, particularly, whether any preventive care is provided, *see, e.g.,* Plaintiffs' Exh. 1 at 12; 3) the adequacy of measures to prevent other relatively common diabetes-specific complications, such as kidney damage, nerve damage, or blood vessel damage, *see, e.g., id.* at 14–16; 4) the existence of and need for diabetic education, *compare, e.g., id.* at 8 with Defendants' Brief at 28–29 (citing, *inter alia,* deposition testimony indicating patient knowledge of diabetic condition).

In short, although Plaintiffs may have had, in general, some access to medical care and the fact that they may not have sustained permanent damage to specific bodily functions or systems as a result of the conditions at ADTC, perhaps the linchpins of Defendants' argument, *see, e.g.,* Defendants' Brief at 5, 11, 13, 26, 27, given the record of treatment, it does not follow that the Defendants are entitled to judgment as a matter of

---

8. If laboratory tests are included in the figures for Rouse and Brooks, the figures change slightly. Total accuchecks and laboratory analysis: for Brooks in 1993, 29, and in 1994, 4; for Rouse in 1993, 33, and in 1994, 13. *See* Defendants' Exh. B2–B3, D2–D3. Brooks and Rouse

are not the most egregious examples of those who, at times, were subject to very infrequent testing. *See, e.g.,* Defendants' Exh. E3 (Kammerer tested, for example, once 1991); *but see* Defendants' Exh. E2.

law on the question of whether the medical care provided the Plaintiffs is constitutionally adequate.[9]

Similarly, on the question of whether Defendants have shown that no factual question exists as to whether Defendants were deliberately indifferent to Plaintiffs' medical needs, Defendants' cursory argument, *see* Defendants' Brief at 30, fails. A review of the materials submitted by the Plaintiffs shows that Plaintiffs could very easily show, and a jury could reasonably conclude, that the risks of inadequate treatment were obvious to a reasonably well-trained doctor, nurse, or prison official, *see, e.g.,* Plaintiffs' Exh. 5–7, and that Dr. Reddy, Dr. Cardinale, a diabetic himself, *see* Plaintiffs' Exh. 14 at 60, Nurse Allen, and Plantier were subjectively aware of the risks of inadequate treatment, but did not respond reasonably. *See, e.g.,* Plaintiffs' Exh. 14 at 35–37, 40–42, 59–60; Exh. 15 at *passim;* Exh. 16 at 19–21, 31, 33; Exh. 17 at *passim;* Exh. 18 at 29–33; *see generally Farmer,* 511 U.S. at 842–45 & n. 8; 114 S.Ct. at 1981–83 & n. 8; *Leavy,* 117 F.3d at 748.

However, Plaintiffs have not adequately responded to Defendants' contention that there is no evidence of Defendant, Fauver's deliberate indifference. *See* Defendants' Brief at 29; *Celotex,* 477 U.S. at 323–26, 106 S.Ct. at 2552–54. Their argument regarding the service of interrogatories is addressed above. *See* III.A.1.a, *supra.* For these reasons, Defendants' motion for summary judgment as to liability on Plaintiffs' claim of a violation of their Eighth Amendment rights will be denied as against Defendants, Plantier, Dr. Cardinale, Dr. Reddy, and Nurse Allen, and granted as to Defendant, Fauver.

### 2. Qualified Immunity

Defendants have also argued that they are entitled to qualified immunity because they acted in an objectively reasonable manner in providing medical care to the insulin-dependent diabetics at ADTC. *See* Defendants' Brief at 31; Defendants' Reply Brief at 14–15.

▆ Generally, government officials are entitled to a qualified immunity when, in performing discretionary functions, their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken." *Id.* at 639, 107 S.Ct. at 3038 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 819, 102 S.Ct. 2727, 2738, 2739, 73 L.Ed.2d 396); *see also Grant v. City of Pittsburgh,* 98 F.3d 116, 122, 125 (3d Cir.1996) (holding that "in evaluating a defense of qualified immunity, an inquiry into the defendant's state of mind is proper where such state of mind is an essential element of the underlying civil rights claim"); *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991) (noting that *Anderson* requires a court to analyze specific official actions of individual claiming qualified immunity).

In this case, Defendants have not argued that Plaintiffs' rights to adequate medical care were not "clearly established" within the meaning of *Harlow,* as restated in *Anderson. See id.* at 639–640, 107 S.Ct. at 3038–3039 ("contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"); *Giuffre v. Bissell,* 31 F.3d 1241, 1255

---

9. Defendants make too much of the fact that Dr. Ryan did not know of more than two correctional institutions which follow the medical guidelines as to the treatment of diabetics. *See, e.g.,* Defendants' Brief at 6; Defendants' Reply Brief in Support of Defendants' Motion to Dismiss 7 (dated Sept. 19, 1997) (hereinafter Defendant's Reply Brief). That Dr. Ryan may be somewhat overcautious in assessing a correctional institu-

tion's medical care does nothing to support the "standard" set by Dr. Cohen. Also, as I have already pointed out, it is society's prevailing and evolving norms which comprise the standard for what constitutes cruel and unusual punishment, not an expert's standard, which may assist in ascertaining, but certainly does not determine, prevailing norms. *See, e.g., Quinlan,* 960 F.2d at 359.

(3d Cir.1994) ("threshold determination is whether the constitutional rights asserted by the plaintiff were clearly established"). Indeed, in light of *Estelle* and under the circumstances of this case, such an argument could not succeed.[10]

Rather, Defendants have stated, without very much support at all, that they "acted in an objectively reasonable manner in providing for the conditions of plaintiffs' confinement." Defendants' Brief at 31. That is, Defendants claim, a reasonable person in the position of the Defendants could not have known that his or her conduct would violate Plaintiffs' rights to adequate medical care of their diabetes.

 Although most defenses of qualified immunity stand or fall on whether the right allegedly violated was "clearly established," it is quite clear that even where the right is clearly established, the defense is still available. In *Harlow*, the Supreme Court held that:

> [o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to know that the law forbade conduct not previously identified as unlawful.... *If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his*

conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained.

*Harlow*, 457 U.S. at 818–819, 102 S.Ct. at 2738–2739 (emphasis added); *see, e.g., In re City of Philadelphia Litig.*, 49 F.3d 945, 961 (3d Cir.1995) (citing *Harlow* and noting standard where right is clearly established), *cert. denied*, 516 U.S. 863, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995); *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir.1990) ("in analyzing a claim of qualified immunity it is ... necessary first to identify the specific .... right allegedly violated, then to inquire whether at the time of the alleged violation it was clearly established, the further to inquire whether a reasonable person in the official's position would have known that his conduct would violate that right."); *Good v. Dauphin Cty. Social Serv. for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir.1989) ("the·ultimate issue is whether ... reasonable officials in the defendants' position ... could have believed ... that their conduct would be lawful [and] even where the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if ... they could have believed their conduct would be consistent with those principles"); *see, e.g., Carrigan v. Delaware*, 957 F.Supp. 1376, 1387 (D.Del.1997).

 Before deciding whether the Defendants are entitled to a defense of qualified immunity, it should be noted as a matter of

10. However briefly, Defendants did argue this point in their reply brief. There, Defendants argue that "[P]laintiff's [sic] seek to assert that the Eighth Amendment requires a level of treatment of diabetic inmates that includes blood sugar testing two to four times a day, annual ophthalmological testing and specific measures with regard to diabetic education, foot care, individualized exercise programs, and exact amount of appetizing food to each diabetic patient.... In this case, the [D]efendants could not have known that the Eighth Amendment required the exact course of care advocated by the [P]laintiffs because there is no law indicating that it does." Defendants' Reply Brief at 15. This misstates Plaintiffs' argument and too narrowly defines the right allegedly violated of Defendants. Plaintiffs have not argued that the Constitution requires

these specific measures, but rather, that the level of care provided to Plaintiffs for their diabetes constitutes deliberate indifference to serious medical needs. While the parties have identified, and the Court has located, no decision which, for example, requires that diabetic inmates have their glucose levels tested a certain number of times per day, *Estelle* and the later cases interpreting it make clear that medical care—including care for prisoners' diabetic conditions—ought be provided. *See, e.g., Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir.1995) (rejecting characterization of right as too narrow and noting that "hold[ing] that [the right should have been defined more narrowly ... would be to allow Appellants, and future defendants, to define away all potential claims").

procedure that the Defendants have raised the issue of qualified immunity so late in this litigation as to have, as a practical matter, forfeited most of the benefits the defense may have afforded them. *See Siegert v. Gilley*, 500 U.S. 226, 232–33, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991) ("one of the purposes of immunity ... is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit"); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (noting that *Harlow* recognized an entitlement not to stand trial or face other burdens of litigation, such as time consuming discovery). The question of whether an official is entitled to qualified immunity is a legal one which "should be decided by the court *long before trial.*" *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (emphasis added); *Sharrar v. Felsing*, 128 F.3d 810, 827 (3d Cir.1997) (clarifying impact of *Hunter* and holding that court should decide what "clearly established" law is and whether actions of officials were objectively reasonable).[11] Indeed, "until the threshold immunity question is resolved, discovery should not be allowed." *Siegert*, 500 U.S. at 232–33, 111 S.Ct. at 1793–94. Thus, the posture in which the Defendants have claimed qualified immunity is, at the very least, somewhat odd.[12]

Because there have been substantial factual questions raised by the parties throughout this litigation, I must decide the issue of the Defendants' qualified immunity based on the Plaintiffs' version of the facts, unless there is

a particular undisputed fact. *See Melo v. Hafer*, 13 F.3d 736, 745 (3d. Cir.1994) (clarifying *Good*, 891 F.2d at 1094–95), *aff'd*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *see, e.g., Philadelphia Litig.*, 49 F.3d at 949; *cf. Johnson v. Jones*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (noting, in discussing appealability of decision regarding qualified immunity, that "court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, *in the light most favorable to the nonmoving party*, likely assumed") (emphasis added). Normally, there is a certain amount of tension between the rule that immunity should be decided as early in the litigation as possible, and the need to resolve factual issues in order to determine whether a violation of clearly established rights has occurred. *See Grant*, 98 F.3d at 122; *see Sharrar*, 128 F.3d 810, 826; *Franklin Building Corp. v. City of Ocean City*, 946 F.Supp. 1161, 1172 (D.N.J.1996) (noting tension). That tension does not disappear where, as in this case, the defendant has delayed a dispositive motion based on qualified immunity until *after* the close of discovery; a court is still likely, perhaps more likely, to have disputed issues of fact before it when deciding qualified immunity following discovery.

Having labored to clarify the qualified immunity inquiry, the answer to the Defendants' claim is relatively straightforward. None of the Defendants has suggested the existence of any "extraordinary circumstances" which may be applicable to this

---

11. *Sharrar* does not completely forestall a district court from submitting a question of qualified immunity to a jury. As Chief Judge Sloviter noted: "only if the historical facts material to the [issue of the officer's objective reasonableness] are in dispute ... will there be an issue for the jury. The reasonableness of the officers' beliefs or actions is not a jury question." *Sharrar*, 128 F.3d 810, 827. I do not believe, however, that *Sharrar* dictates that the question of the adequacy of the medical care provided for the Plaintiffs as a matter of medical science be submitted to a jury. This is because the Defendants could not have believed that the medical care provided was reasonable even under the standard they or their expert advocated. Moreover, the existence of a factual dispute over, for example, the frequency of glucose testing necessary for the plaintiffs, as a

matter of medical science, however, constitutes an alternative ground for denying Defendants' motion for summary judgment on qualified immunity.

12. While Defendants did correctly assert it as a defense in their Answer to the Second Amended Complaint, *see* Answer at 8 (dated Nov. 10, 1995); *see generally Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980), no dispositive motions were filed on this issue, even after Judge Bassler raised the issue and predicted that there would be such motions filed. *See Rouse I*, slip op. at 8 ("Although Defendants have not yet moved to dismiss because of qualified immunity, this issue is virtually certain to arise.").

case. Nor has any Defendant suggested that he or she did not know the relevant legal standard, or that he or she should not have known the relevant legal standard. *See Harlow,* 457 U.S. at 818–819, 102 S.Ct. at 2738–39. Rather, all Defendants have argued is that they acted reasonably under the circumstances, essentially the same defense made in response to the claim of "deliberate indifference." *Cf. Oliveira v. Mayer,* 23 F.3d 642, 648–49 (2d Cir.1994) (noting relationship between objective reasonableness in determining whether officers' actions constituted a violation of the Fourth Amendment and objective reasonableness in determining whether officers are entitled to qualified immunity), *cert. denied,* 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995). However one characterizes Defendants' "qualified immunity" argument, the same factual material which the Court evaluated in order to deny the Defendants' motions for summary judgment is sufficient to show that Defendants have not sustained their burden of demonstrating that they should not be charged with knowing the legal significance of their conduct. *See Grant,* 98 F.3d at 124–25 (inquiry into defendant's state of mind proper where state of mind is essential element of underlying civil rights claim).

Of particular relevance in determining whether the Defendants could have reasonably believed their actions were lawful is the very strong factual showing made by Plaintiffs' that the Defendants were deliberately indifferent to Plaintiffs serious medical needs, that is, the evidence that Defendants knew what the appropriate level of care for a diabetic was and knew that the level of care provided was far short of it. *See generally* III.1.A, *supra.* Perhaps as the most egregious example and the one I consider most serious, knowing that glucose is normally tested at the very least once a day for patients like Plaintiffs, Defendants could not have reasonably believed that glucose testing in many cases less than twenty times a *year* for these particular Plaintiffs was reasonable medical care. Not even Defendants' expert could bring himself to say with specificity

that testing twenty or so times a year was sufficient as a general matter for all diabetics, but only for those who were particularly well managed and had stable diets. *See* Defendants' Exh. O at 63. Defendants could not, however, have reasonably thought that Plaintiffs were among the group of insulin-dependent diabetics who could tolerate such infrequent testing, given: 1) the substantial evidence of serious fluctuations in the glucose levels of some of the Plaintiffs, *see, e.g.,* Defendants' Exh. D3; 2) the extended periods over which the glucose levels were well above the levels even Dr. Reddy believed to be reasonable; 3) the frequency with which the glucose levels were well above normal ranges. *See, e.g.,* Plaintiffs' Exh. 16 at 17; *but see* Plaintiffs' Exh. 1 at 3; Plaintiffs' Exh. 5 at 2; *see also* Defendants' Exh. B3, D3, F3. Therefore, Defendants, Plantier, Dr. Cardinale, Dr. Reddy, and Nurse Allen, are not entitled to a defense of qualified immunity.[13] The motion for summary judgment as to the defense of qualified immunity will therefore be denied.

## B. Americans with Disabilities Act Claim

Defendants' contentions in support of qualified immunity as a defense to Plaintiffs' claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* are more persuasive. This is because, at the time of the alleged violations of the ADA and even, to some extent, up to the present, it has not been clearly established that the ADA applies to state and locally-operated prisons.

In June 1995, the Court of Appeals for the Fourth Circuit held that the prison officials were entitled to qualified immunity as a defense to a claim under the ADA because, at the time of the violations, it was not clearly established that the statute applied to state prisons. *Torcasio v. Murray,* 57 F.3d 1340 (4th Cir.1995), *cert. denied,* 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996). *Torcasio* further intimated that the ADA did not apply to state prisons. This view was confirmed in *Amos v. Maryland Dep't of Pub.*

---

13. Because Defendants' motion for summary judgment on liability as to Fauver will be granted, the Court has not considered the merits of

Fauver's qualified immunity defense. That motion will be dismissed as moot.

*Safety & Correctional Serv.*, 126 F.3d 589 (4th Cir.1997), a decision which quite comprehensively reviews the substantial split among the Circuit Courts of Appeal on this issue, *id.* at 597–600 (noting decisions and reach thereof in Ninth, Eleventh, Tenth, Seventh, and Third Circuits), and holds that the Rehabilitation Act and the ADA do not apply to state prisons, *id.* at 600–601.

The Court of Appeals for the Third Circuit confronted the issue of the applicability of the ADA to prisons in *Inmates of Allegheny Cty. Jail v. Wecht*, 93 F.3d 1124 (3rd Cir. 1996), *vacated and withdrawn*, 93 F.3d 1146 (3d Cir.1996). Noting the split of authority among circuit courts as to the applicability of the ADA to prisons, including the *Torcasio* decision, 93 F.3d 1124, 1996 WL 474106 at *7–*8, and the split among the district courts of the Third Circuit regarding the applicability of a statute very similar in scope to the ADA, the Rehabilitation Act, 29 U.S.C. § 794a; *id,* 1996 WL 474106, at *8 n.11, the court in *Wecht* held that the ADA and the Rehabilitation Act do apply to correctional facilities. *Id.* 1996 WL 474106, at *10. Whatever clarification of the issue of the reach of the ADA *Wecht* may have provided did not last particularly long. Approximately a month later, that decision was vacated and an *en banc* rehearing of the case was granted. *See Wecht*, 93 F.3d at 1146.

The Third Circuit would eventually reach the question of the applicability of the ADA to state prisons. However, before doing so, the Third Circuit, without explanation, affirmed a district court opinion which relied on *Torcasio* and held that "the ADA should not be held applicable to facilities provided for prisoners in state prisons in the absence of a clear expression of congressional intent that that be the case, and we are not convinced that such intent has been expressed." *Little v. Lycoming Cty.*, 912 F.Supp. 809, 819–20 (M.D.Pa.1996), *aff'd mem.*, 101 F.3d 691 (3d Cir.1996). *Little* also held that, even if the ADA did apply to state prisons, the

defendants in that case were entitled to qualified immunity because, as of the time of the violation, a state prisoner's rights under the ADA had not been clearly established. *Little*, 912 F.Supp. at 820. When the Third Circuit finally did hold that the ADA and the Rehabilitation Act do apply to state prisons, it found the approach in *Torcasio* "seriously flawed." *See Yeskey v. Commonwealth of Pennsylvania Dep't of Corrections,* 118 F.3d 168, 172 (3d Cir.1997), *petition for cert. filed,* 66 U.S.L.W. 3298 (Oct. 8, 1997); *but see Amos,* 126 F.3d at 599–600.

■ In light of the fact that more than one court of appeals has found the ADA inapplicable to state prisons, and the circuitous route which the Third Circuit has taken in deciding (holding first that it does apply, but vacating that decision; then affirming without opinion a district court which found that the ADA does not apply; and finally deciding that the ADA does apply), it cannot be said the Plaintiffs' rights were clearly established until, at the very least, the Third Circuit's decision in *Yeskey*, which was decided on July 10, 1997.[14] The Defendants "could not reasonably be expected to anticipate subsequent legal developments, nor could [they] fairly be said to know that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818–819, 102 S.Ct. at 2738–2739. The Defendants are therefore entitled to summary judgment on their defense of qualified immunity to Plaintiffs' ADA claim. Because the Court need not consider it, the motion for summary judgment as to liability under the ADA will be dismissed as moot.

## IV. Class Representation Issues

Judge Bassler certified a class "consisting of all former, present, and future insulin-dependent diabetics" and a subclass consisting "of all former and present insulin-dependent diabetics" imprisoned at ADTC. *Rouse II,* slip op. at 27; *see also id.* at 4–5 (noting

**14.** Plaintiffs' citation of 28 C.F.R. § 35.190(b)(6) (delegating responsibility for implementation of regulations relating to ADA to Department of Justice for "[a]ll programs, services, and regulatory activities relating to," *inter alia,* "correctional institutions") as a basis for asserting that

Plaintiffs' rights were clear is not very helpful. That regulation does not clarify the existence of the right, to the extent necessary, any more than the statute on its face does. *Compare Yeskey,* 118 F.3d at 171–72, with *Amos,* 126 F.3d at 606–607.

that Plaintiffs seek declaratory and injunctive relief for class, and punitive and compensatory damages for subclass). When Judge Bassler certified the class, on March 26, 1996, two of the named Plaintiffs were not then incarcerated at ADTC. *Id.* at 18 n.4. Currently, it appears that *none* of the named Plaintiffs is incarcerated at ADTC. While this alone does not moot the controversy, *see Sosna v. Iowa,* 419 U.S. 393, 399–403, 95 S.Ct. 553, 557–559, 42 L.Ed.2d 532 (1975); *Nelson v. Murphy,* 44 F.3d 497, 500 (7th Cir.1995) (Easterbrook, J.), *cert. denied,* 516 U.S. 1027, 116 S.Ct. 671, 133 L.Ed.2d 521 (1995); *Rosetti v. Shalala,* 12 F.3d 1216, 1225 (3d Cir.1993) (distinguishing between cases where plaintiff's claim becomes moot before certification of class and where plaintiff's claim becomes moot after certification of class), "this conclusion does not automatically establish that [a litigant without a live controversy] is entitled to litigate the interest of the class she seeks to represent." *Sosna,* 419 U.S. at 403, 95 S.Ct. at 559. Rather, it "shift[s] the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interest of the class' " in accordance with Rule 23 of the Federal Rules of Civil Procedure. *Id.; see, e.g., Hassine v. Jeffes,* 846 F.2d 169, 178–79 (3d Cir.1988).

In this case, it appears (and I do not intimate an opinion on these questions either way) that without any of the named Plaintiffs currently incarcerated at ADTC, there may not be adequate representation of the class for the purposes of injunctive relief. Additionally, it appears that there may be conflicts between the class and the representatives of the subclass, because, the representatives of the subclass, none of whom is currently incarcerated at ADTC, may have little interest in injunctive or declaratory relief. Also, because both the class and subclass certified by Judge Bassler were made up of *insulin-dependent* diabetics, if Kammerer is no longer insulin-dependent, *see* Defendants' Brief at 13, he may no longer be an adequate representative of the class *or* the subclass. Finally, because claims for some of Jankowski's injuries may be barred by the doctrine of claims preclusion, the administrator of his estate may not be an adequate representative of the class. *See, e.g.,* Defendants' Brief at 18 n. *; Defendants' Exh. G1. The Court will attempt to address and resolve these class action issues at a case management conference with counsel which will be scheduled as soon as possible.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment on liability for Plaintiffs' Eighth Amendment claims will be denied as to Defendants, Plantier, Dr. Reddy, Dr. Cardinale, and Nurse Allen. Defendants' motion for summary judgment on liability for Plaintiffs' Eighth Amendment claims will be granted as to Defendant, Fauver. Defendants' motion for summary judgment based upon the defense of qualified immunity on Plaintiffs' Eighth Amendment claims will be denied as to Defendants, Plantier, Dr. Reddy, Dr. Cardinale, and Nurse Allen, and dismissed as moot as to Defendant, Fauver. Defendants' motion for summary judgment based upon the defense of qualified immunity on Plaintiffs' claims under the Americans with Disabilities Act will be granted as to all Defendants. Defendants' motion for summary judgment as to liability on Plaintiffs' claim under the Americans with Disabilities Act will be dismissed as moot as to all Defendants. The Court will enter an appropriate order.